**In re ATLANTIC CONTAINER CORP., an Illinois corporation, Debtor.**

**Bankruptcy No. 89 B 19710.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Nov. 27, 1991.

Paul M. Bauch, Bell, Boyd & Lloyd, Chicago, Ill., for Trustee.

Daniel R. Madock, Fox and Grove, Chtd., Chicago, Ill., for LaSalle Nat'l Bank, as Trustee u/t/a dated 11/22/78 and known as Trust No. 10–34732–09.

Harry D. Lavery, Berger, Newmark & Fenchel, Chicago, Ill., for LaSalle Nat'l Bank, as Trustee u/t/a # 50630 dated 4/20/76 and Howard C. Bushnell, its beneficiary.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on cross-Motions for Partial Summary Judgment regarding the Trustee's Objections and Supplemental Objections to the Proofs of Claim and Requests for Payment of Administrative Expenses of LaSalle National Bank as Trustee under Trust No. 50630 and as Trustee under Trust No. 10–34732–09. The Court, having reviewed the record, now rules as follows.

## FINDINGS OF FACT

On November 20, 1989, Atlantic Container Corp. [the Debtor] filed a petition for voluntary relief under Chapter 11 of the Bankruptcy Code. From November 20, 1989 through June 22, 1990, the Debtor operated its business and managed its property as Debtor-in-Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. On June 22, 1990, the case was converted from a Chapter 11 reorganization case to a Chapter 7 liquidation case.

LaSalle National Bank, as Trustee under Trust No. 50630 [LaSalle–North], is the legal title holder of certain real property located at 100 West North Avenue in Lombard, Illinois [the LaSalle–North property]. LaSalle–North leased this property to the Debtor pursuant to a Lease dated November 28, 1986, the term of which was extended through March 31, 1995 [the LaSalle–North Lease]. LaSalle National Bank, as Trustee under Trust No. 10–34732–09 [LaSalle–Ridge], is the legal title holder of certain real property located at 1133 Ridge Avenue in Lombard, Illinois [the LaSalle–Ridge property]. LaSalle–Ridge leased this property to the Debtor pursuant to a Lease dated December 6, 1982, the term of which was extended through December 5, 1992 [the LaSalle–Ridge Lease]. LaSalle–North and LaSalle–Ridge will be referred to collectively as "the Landlords." The two properties will be referred to collectively as "the Premises."

The LaSalle–Ridge Lease contains the following provision regarding the Debtor's obligation to repair and maintain the property:

> Tenant covenants throughout the term of this Lease, at Tenant's sole costs and expenses, to keep and maintain the Leased Premises, the building (excepting only the roof, walls and structural members thereof and with respect thereto except for any damage caused by the act or neglect of Tenant, its employees, agents or representatives) and improvements now or hereafter located on the Leased Premises, ... in good condition and repair....

LaSalle–Ridge Lease, para. 9.1. In addition, the LaSalle–Ridge Lease obligated the Debtor to return the property in good condition upon termination of the Lease:

> Upon the termination of this Lease ... or upon the termination of Tenant's right to possession of the Leased Premises, Tenant will at once surrender and deliver up the Leased Premises, together with all improvements thereon, to Landlord in good condition and repair, reasonable wear and tear excepted.

LaSalle–Ridge Lease, para. 17.0. The LaSalle–North Lease contains similar provisions. *See* LaSalle–North Lease, para. 702, 704.

Between November 20, 1989 and June 22, 1990, the Debtor-in-Possession [DIP] sought and received three extensions of time to assume or reject the two Leases under § 365(d) of the Code, over the objections of the Landlords. During this time period, the DIP continued in possession of both the LaSalle–North and LaSalle–Ridge properties and made rental payments pursuant to the two Leases.

After the case was converted to a Chapter 7 liquidation case on June 22, 1990, the Trustee commenced occupancy of the Premises. The Trustee also sought an extension of the time to assume or reject both Leases under § 365(d). The Landlords objected, alleging, *inter alia*, that the Debtor and the Trustee had failed to repair and maintain the Premises as required by the Leases, creating a potential for damage to the Premises. On July 20, 1990, this Court denied the Trustee's Motion to Extend the

Time to Assume or Reject the Leases. Because the Trustee declined to assume the Leases, the Leases were deemed rejected.[1] However, the Court authorized the Trustee to remain in possession of the Premises for 60 days, commencing on August 17, 1990, in order to sell and remove all of the estate's tangible personal property located on the Premises.

Pursuant to an agreed order entered on October 2, 1990, the Trustee paid LaSalle–North and LaSalle–Ridge $43,944.45 and $40,914.34, respectively, for use and occupancy of the premises from July 21, 1990, through and including September 20, 1990. The order also authorized and directed the Trustee to pay $732.40 to LaSalle–North and $681.99 to LaSalle–Ridge for each day of use and occupancy from September 21, 1990 until the Trustee vacated the Premises. On or about October 13, 1990, the Trustee paid $16,845.20 to LaSalle–North and $15,685.77 to LaSalle–Ridge for use and occupancy of the Premises from September 21, 1990 through October 13, 1990. Thus, the post-petition payments for rent and for use and occupancy which the Landlords received from the Debtor as Debtor-in-Possession and the Trustee totalled $218,903.40 for LaSalle–North and $213,-022.58 for LaSalle–Ridge.

The Trustee substantially vacated the Premises on October 13, 1990. Several drums of waste materials, however, remained on the Premises until May 7, 1991. The Trustee assumed the obligation and cost of removing and legally disposing of the drums and their contents.

LaSalle–North filed, then subsequently amended and reduced, a timely Proof of Claim with an attached Request for Payment of Administrative Expenses. In its final Proof of Claim, LaSalle–North claimed lease rejection damages of $252,-939.74. In addition, LaSalle–North claimed $124,060.28 as an administrative expense, representing charges for use and occupancy of the LaSalle–North property for the period from October 14, 1990 through May 7, 1991, the time during which the Debtor's drums of hazardous materials remained on the property. LaSalle–North also asserted an unliquidated administrative expense claim for environmental damage to the property.[2] Finally, LaSalle–North claimed $170,326.31 for repair and maintenance expenses which it alleges will be required to remedy physical damage to the property caused by the Debtor's and the Trustee's failure to perform necessary maintenance. These costs were claimed alternatively 1) as pre-petition damages in their entirety; or 2) as $127,063.43 in pre-petition damages and $43,262.88 in administrative expenses, prorated according to periods of occupancy.

LaSalle–Ridge also filed a timely Proof of Claim and Request for Payment of Administrative Expenses. LaSalle–Ridge claimed $758,865.52 in lease rejection damages. In addition, LaSalle–Ridge claimed an unliquidated amount as an administrative expense for use and occupancy charges from October 14, 1990 through May 7, 1991, the period in which the Debtor's drums of hazardous materials remained on the property. Like LaSalle–North, LaSalle–Ridge also asserted an unliquidated administrative expense claim for environmental damage to the property.[3] Finally, LaSalle–Ridge asserted a $695,-290.35 pre-petition damage claim for physical neglect and damage to the property which occurred before the filing of the bankruptcy petition, and a $414,754.32 administrative expense claim for physical neglect and damage to the property which occurred post-petition, as well as for post-petition real estate taxes and insurance premiums. LaSalle–Ridge alleges that some of the physical damage to the property resulted from willful neglect of repair and maintenance obligations and/or inten-

---

1. Under § 365(d)(1), if a Chapter 7 trustee fails to assume an unexpired lease within the period of time provided by the court, the lease is deemed rejected. 11 U.S.C. § 365(d)(1).

2. The Trustee has represented to both LaSalle–North and LaSalle–Ridge that he has conducted an environmental review of the Premises and

has concluded that there are no hazardous conditions requiring remediation. The claims for environmental damage, therefore, are not currently at issue.

3. See footnote 2, above.

tional infliction of injury. Response of La-Salle National Bank as Trustee, Under Trust No. 10–34732–09 to Trustee's Objections and Supplemental Objection to Proofs of Claim for Prepetition Damages and Administrative Expenses [Response, Trust No. 10–34732–09], at 9.

The Trustee filed Objections and Supplemental Objections to both Landlords' Proofs of Claim and Requests for Payment of Administrative Expenses, raising several factual and legal challenges to the Landlords' pre-petition damage and administrative expense claims. After exchanging briefs regarding these challenges, the Trustee and the Landlords filed cross-Motions for Partial Summary Judgment. The parties argue that the following legal issues presented in the Trustee's Objections and Supplemental Objections and the subsequently-filed briefs are appropriate for summary judgment:

1) whether the Landlords' pre-petition claims for physical damage to the Premises and for repair and maintenance expenses constitute claims for "future rent" or "lease termination damages," which are subject to the cap or ceiling of § 502(b)(6) of the Bankruptcy Code;

2) whether the Landlords' maximum allowable claim for lease termination damages, as computed under § 502(b)(6), must be reduced by the amount of money the Landlords received from the DIP and the Trustee for post-petition rent and for post-petition use and occupancy of the Premises;

3) whether the Landlords may assert administrative expense claims for physical damage to the Premises which occurred post-petition, and whether the Landlords may allocate their physical damage claims between pre-petition damages and administrative expenses based on periods of occu-pancy by the Debtor, the DIP and the Trustee.[4]

## CONCLUSIONS OF LAW

The Court agrees that the three legal issues enumerated above may appropriately be resolved by summary judgment. Under Bankruptcy Rule 7056 and Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the record before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The primary purpose of a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Savings & Loan Ass'n*, 806 F.2d 146, 149 (7th Cir.1986). In this case, genuine factual disputes do exist between the parties. The three issues which are the subject of these cross-Motions for Partial Summary Judgment, however, are purely legal issues. Resolution of these issues by summary judgment may significantly limit the scope of subsequent evidentiary proceedings, thereby conserving judicial time and resources. Partial summary judgment with regard to these three issues, is therefore appropriate. The three issues will be considered *seriatim.*

A. *Do the Landlords' pre-petition claims for physical damage to the Premises and for repair and maintenance expenses constitute claims for "future rent" or "lease termination damages," which are subject to a cap or ceiling under § 502(b)(6) of the Bankruptcy Code?*

### 1. Background

Under § 365(a) of the Bankruptcy Code, a trustee or debtor-in-possession may, sub-

**4.** The Landlords have also moved for summary judgment on the issue of whether they have allowable administrative expense claims in the amount of reasonable use and occupancy charges for the time period from October 14, 1990 through May 7, 1991, when the Trustee allowed several drums of waste material to remain on the Premises. The Landlords base these claims on their allegation that local ordinances prevented them from selling or leasing the Premises until the material was removed.

The Landlords have not cited any statutory or judicial authority in support of these administrative claims. The Trustee has not challenged the Landlords' assertion that these claims are entitled to administrative priority; however, it is unclear that the Landlords were unable to re-let the Premises during this period solely because of the presence of these drums. Because this issue has not been briefed by any of the parties, the Court declines to rule on this issue at this time.

ject to court approval, assume or reject any unexpired lease of the debtor. 11 U.S.C. §§ 365(a); 1107(a). Rejection of a lease constitutes a breach of the lease. 11 U.S.C. § 365(g). The Lessor of a rejected lease may terminate the lease and assert a claim against the bankruptcy estate for any damages suffered as a result of the termination. *In re Emple Knitting Mills, Inc.*, 123 B.R. 688 (Bankr.D.Me.1991). This claim is treated as if it arose before the filing of the bankruptcy petition. 11 U.S.C. § 502(g).

A Lessor's claim for damages for termination of an unexpired lease is subject to a statutory cap. Section 502(b)(6) of the Bankruptcy Code provides that "the claim of a lessor for damages resulting from the termination of a lease of real property" is limited to:

> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6). According to the legislative history, § 502(b)(6) is designed to compensate a landlord for the loss suffered upon termination of a lease, while not permitting large claims for breaches of long-term leases to prevent other general unsecured creditors from recovering from the estate. S.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5849, 6308.

### 2. The Parties' Arguments

The Trustee argues that the Landlords' claims for physical damage to the Premises and for repair and maintenance expenses constitute "damages resulting from the termination of a lease of real property" which are subject to the § 502(b)(6) statutory cap. The Trustee asserts that the Landlords' repair and maintenance claims arise from the Debtor's breach of the Leases' "restoration covenants," in which the Debtor promised to return the Premises to the Landlords in good condition, excepting natural wear and tear. *See* LaSalle–North Lease, para. 704; LaSalle–Ridge Lease, para. 17.0. According to the Trustee, the Debtor's breaches of the restoration covenants necessarily arose only upon termination of the Leases. Trustee's Reply Memorandum in Support of Objections to Landlords' Proofs of Claim [Trustee's Reply], at 3–4. In addition, the Trustee argues that Congress specifically intended § 502(b)(6) to limit claims for damages for breaches of non-monetary lease covenants, such as restoration covenants and repair and maintenance covenants. The Trustee notes that § 502(b)(6)'s predecessor explicitly limited claims arising from breaches of non-monetary lease covenants, and argues that Congress intended to carry forward this limitation in § 502(b)(6). *Id.* at 4–5.

As an alternative theory, the Trustee argues that the cost of repairs necessary to remedy the physical damage allegedly caused by the Debtor's neglect of its maintenance duties can be considered "future rent," which is subject to the § 502(b)(6) limitation on termination damages. Both the LaSalle–North and the LaSalle–Ridge Leases provide that if the Lessee defaults on its repair and maintenance covenants, the Landlord may, after giving notice of default, make the necessary repairs itself and charge the costs to the Lessee as "additional rent." *See* LaSalle–North Lease, para. 708; LaSalle–Ridge Lease, para. 19.2. The Trustee therefore argues that if the Landlords incur the anticipated repair and maintenance expenses, the expenses will be charged to the estate, pursuant to the Leases, as additional rent arising during the post-petition period. Trustee's Reply, at 5 n. 3.

The Landlords, on the other hand, argue that their claims for physical damage to the Premises and for repair and maintenance expenses are not "termination damages" under § 502(b)(6). They assert that they

are entitled to a separate pre-petition claim for repair and maintenance expenses which is not limited by the § 502(b)(6) statutory cap. They propose several alternative views of the nature of their repair and maintenance claims. First, the Landlords suggest that the cost of remedying physical damage to the property caused by the Debtor's neglect of its maintenance responsibilities may be considered "unpaid rent" due at the date of the bankruptcy petition. Claims for unpaid pre-petition rent are fully allowed under § 502(b)(6)(B). Response of LaSalle National Bank Trust # 50630, Lessor, to Trustee's Objections and Supplemental Objection to LaSalle's Proof of Claim and Request for Payment of Administrative Expenses [Response, Trust No. 50630], at 9. Alternatively, the Landlords suggest that their claims for repair and maintenance costs arise from the Debtor's failure to perform its repair and maintenance covenants under the Leases. Because the Debtor's liability for failure to perform these covenants existed before the termination of the Leases, the repair and maintenance claims are not "termination damages." *Id.* at 9–10. Finally, the Landlords suggest that the repair and maintenance claims may be viewed as claims for damage to the Landlords' reversionary interests in the Premises. The damage to the Landlords' reversionary interests is independent of the damage the Landlords suffered from the termination of the Leases. Response, Trust No. 10–34732–09, at 9.

### 3. Discussion

■ Both the LaSalle–Ridge and the LaSalle–North Leases provide the lessor with alternative means of recovery for a lessee's breach of its repair and maintenance obligations. During the term of the Leases, the Landlords had the right to cure the lessees' failure to repair and maintain by making needed repairs and billing the costs to the tenants as additional rent. *See* LaSalle–North Lease, para. 708; LaSalle–Ridge Lease, para. 19.2. The Landlords also had the right to treat the failure to maintain and repair as an act of default and to terminate the Leases. Upon terminating the Leases, the Landlords could recover damages, including (1) the amount, if any, of delinquent rent payments; (2) an amount equal to the value of the rents for the balance of the lease term; (3) damages for the lessee's breach of any lease covenants (including the covenant to repair and maintain); and (4) the costs and expenses of reletting the premises. *See* LaSalle–North Lease, para. 2301, 2305; LaSalle–Ridge Lease, para. 18.

Upon the Trustee's rejection of the Leases in this case, the Landlords chose to treat the Leases as terminated and asserted claims for damages against the bankruptcy estate. The Landlords therefore no longer have the option of curing the breach of the covenants to repair and maintain by making the needed repairs and charging the costs to the Debtor or Trustee as additional rent. Because the Leases are considered terminated, the Landlords are limited to recovering damages.

Under the damage scheme outlined in the Leases, costs incurred to remedy damage to the leased Premises caused by a lack of maintenance may be characterized either as damages from the tenants' breach of the covenant to repair and maintain or as costs of preparing the property for reletting. Outside of bankruptcy, it does not matter into which category these costs are placed because they are recoverable regardless of how they are characterized. As is often the case, however, the Bankruptcy Code requires costs to be categorized, with items in different categories receiving very different treatment.

■ Thus, if the costs of repairs following the rejection of an executory lease are considered costs of reletting the Premises, they constitute claims for damages from termination of the lease, and are therefore subject to the § 502(b)(6) limitation. Several courts have recognized that costs incurred in attempting to relet the property covered by a rejected lease, such as attorneys' fees, brokers' fees, taxes, and costs for remodelling and reconstruction necessary to make the property suitable for a new tenant, constitute "damages resulting from the termination of a lease of real property" which are subject to the

§ 502(b)(6) ceiling. *See In re McLean Enterprises, Inc.*, 105 B.R. 928, 936 (Bankr. W.D.Mo.1989); *In re Storage Technology Corp.*, 77 B.R. 824, 825 (Bankr.D.Colo. 1986); *In re Goldblatt Bros., Inc.*, 66 B.R. 337 (Bankr.N.D.Ill.1986); *In re City Stores Co.*, 23 B.R. 201, 204 (Bankr. S.D.N.Y.1982).[5] If, on the other hand, the repair costs are considered damages for the breach of a lease covenant, separate and apart from the lease termination, then it is less clear whether the costs are subject to § 502(b)(6).

The Trustee argues that the predecessor to § 502(b)(6) imposed a limit on both rent claims and claims for breaches of non-monetary lease covenants such as covenants to repair and maintain. Section 63(a)(9) of the Bankruptcy Act provided:

> the claim of a landlord for damages or injury resulting from the rejection of an unexpired lease of real estate *or for damages or indemnity under a covenant contained in such lease* shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next exceeding the date of the surrender of the premises to the landlord or the date of re-entry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount equal to the unpaid rent accrued, without acceleration, up to date.

(emphasis added). Although the language referring to "damages or indemnity under a covenant contained in such lease" was inexplicably omitted from the text of § 502(b)(6), the Trustee argues that § 502(b)(6), like its predecessor, applies to breaches of non-monetary lease covenants. In support of his argument, the Trustee points to legislative history which states that § 502(b)(6) was "derived from current law" and that the landlord's allowed claim "is for his *total* damages, as limited by [§ 502(b)(6) ]." (emphasis added). Trustee's Reply, at 4–5. Common sense, as well as traditional methods of statutory con-

struction, however, suggest that Congress must have had some reason for omitting the reference to damages for breaches of lease covenants when it enacted § 502(b)(6). At best, it can be said that the text of § 502(b)(6) is unclear with regard to its application to breaches of lease covenants not caused by or causing the termination.

■ This court declines to enter the debate on whether the "plain meaning" of a statute always controls and whether "legislative intent" is a myth. *See, e.g.,* discussion by Justice Scalia in *Taylor v. United States*, 495 U.S. 575, ——, 110 S.Ct. 2143, 2160, 109 L.Ed.2d 607 (1990) (Scalia, J., concurring in part and concurring in the judgment). For purposes of this case, it is sufficient to note that the phrase "damages resulting from the termination of a lease" does not seem to contemplate the type of damages being sought here. The phrase suggests that § 502(b)(6) is intended to limit only those damages which the lessor would have avoided but for the lease termination. Any damages caused to the Premises by the Debtor's failure to fulfill its repair and maintenance obligations are unrelated to the termination of the lease.

In addition, the formula for calculating the maximum allowable claim for termination damages under § 502(b)(6) suggests that the primary purpose of the section is to limit claims for *prospective* damages resulting from the lease termination. Under § 502(b)(6)(B), a lessor is permitted to claim, without limitation, the entire amount of rent which is due and owing under the lease as of the earlier of the bankruptcy filing date and the date the lessee ceased to occupy the premises. 11 U.S.C. § 502(b)(6)(B). Claims for *future rent* under the lease, however, are subject to a statutory limit.

The history of the development of § 502(b)(6) also suggests that the drafters' primary concern was with limiting *prospec-*

---

5. At least one bankruptcy court has held that the loss of future rent is the only lease termination damage subject to the § 502(b)(6) statutory limitation. *See In re Internat'l Coins and Currency, Inc.*, 18 B.R. 335, 338 (Bankr.D.Vt.

1982) ("It is clear that the only reference [in § 502(b)(6) ] as to the claim under an unexpired lease is rent.") This case reads the phrase "damages resulting from the termination of a lease of real property" too narrowly.

*tive* damage claims. The Bankruptcy Act of 1898 as originally enacted was silent regarding whether landlords could assert claims for future rent. Courts deciding cases under the original Act almost uniformly denied claims for rent accruing after the bankruptcy filing on the grounds that such future rent was contingent upon uncertain events and was incapable of proof. *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 918 (2d Cir.1944). In 1934, Congress adopted the predecessor to § 502(b)(6) of the current Bankruptcy Code, which made claims for future rent specifically provable but subject to a statutory cap. This provision, like the current § 502(b)(6), was a compromise between the interests of landlords in asserting their claims, and the interests of other general creditors. *Id.* at 920. The concern expressed in the House and Senate Reports on the current § 502(b)(6), that large claims for breaches of *long-term leases* might prevent other general unsecured creditors from sharing in the bankruptcy estate, further indicates that the drafters of § 502(b)(6) were concerned primarily with limiting claims for future rent as opposed to claims arising from pre-petition events. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977).

Thus, the limitation imposed by § 502(b)(6) represents a Congressional policy judgment:

> First, it ensures that non-lessor creditors recover more than the minimal portions of their claims they would recover if landlord claims resulting from termination of long term leases were allowed in full. Second, it ensures that lessors obtain a reasonable portion of the damages they suffered as a result of an abandonment of a lease by a bankrupt.

*Goldblatt Bros.*, 66 B.R. at 346. The repair damages sought here have nothing to do with the long-term nature of the leases. Subjecting these claims to the § 502(b)(6) limitation would deviate severely from the real and reasonable expectations of the parties to the Leases. This court declines to impose such a result absent a clear and unambiguous direction from Congress, especially where, as here, it is alleged that at least some of the damage to the Premises was intentional.

Furthermore, the case cited by the Trustee for the proposition that under § 63(a)(9) of the Bankruptcy Act repair and maintenance claims were treated as "future rent," does not say quite what the Trustee asserts. *See In re United Cigar Stores Co. of America*, 86 F.2d 629 (2d Cir.1936). At the time of *United Cigar Stores*, § 63(a)(9) permitted a lessor on a rejected lease to claim damages in an amount up to the rent reserved by the lease for the three years following the earlier of the lessee's surrender of the property or the landlord's reentry. The lessor in *United Cigar Stores* argued that the estimated cost of keeping the property in good repair over the three-year period could be claimed as "additional rent" because the lease had imposed repair and maintenance obligations on the tenant. The court agreed, stating that the repair and maintenance expenses "seem to us to have been made rent by agreement of the parties." *In re United Cigar Stores*, 86 F.2d at 633. Thus, one key to the holding was the finding that the parties *agreed* that repair and maintenance expenses were to be treated like rent. Moreover, the court in *United Cigar Stores* addressed only repair and maintenance costs which would be incurred in the future to *keep* the property in good condition following the lessee's rejection of the lease. It does not address repair and maintenance costs which are incurred to *remedy* damages to the property caused by the tenant's *past failure* to fulfill its obligations under the lease. Under the reasoning of *United Cigar Stores*, costs incurred to remedy past damage to the property would constitute *past* rent due, which is fully allowable under § 502(b)(6)(B), rather than *future* rent, which is subject to the § 502(b)(6) ceiling. Thus, whether they are considered damages for breaches of covenants to repair and maintain or unpaid past-due rent, the Landlords' claims for expenses incurred to remedy damage to the leased Premises are not subject to the § 502(b)(6) statutory cap.

B. *Should the Landlords' maximum allowable claim for lease termination damages, as computed under § 502(b)(6), be reduced by the amount of money the Landlords received from the DIP and the Trustee for post-petition rent and for post-petition use and occupancy of the Premises?*

### 1. The Parties' Arguments

A landlord's maximum allowable claim for lease termination damages under § 502(b)(6) is computed by first determining the landlord's *total* actual lease termination damages, including all lost future rental income and costs incurred in attempting to relet the property. *McLean Enterprises,* 105 B.R. at 936. The total actual damages are then capped under § 502(b)(6) at the amount of rent reserved under the lease for the greater of 1) one year; or 2) 15 percent of the remaining term of the lease, not to exceed three years. 11 U.S.C. § 502(b)(6). If the total damages incurred by the landlord are greater than the § 502(b)(6) statutory cap, the landlord's allowable claim is equal to the full statutory limit. *Goldblatt Bros.,* 66 B.R. at 346.

The Trustee argues that once the Landlords' maximum allowable claim for lease termination damages is computed under § 502(b)(6), the allowable claim must be reduced by the amount of money the Landlords received from the DIP and the Trustee after the filing of the bankruptcy petition for rent and for use and occupancy. Trustee's Supplemental Objection to the LaSalle National Bank, as Trustee Under Trust No. 10–34732–09 Proof of Claim for Prepetition Damages and Proof of Claim Requesting Payment of Administrative Expenses; Trustee's Supplemental Objection to the LaSalle National Bank, as Trustee Under Trust No. 50630 Proof of claim for Prepetition Damages and Proof of Claim Requesting Payment of Administrative Expenses. The Landlords, on the other hand, argue that the post-petition rent and post-petition use and occupancy payments they received from the DIP and the Trustee should *not* be applied against their maximum allowable claim for lease termination damages. They argue instead that these post-petition payments should merely be subtracted in the computation of total actual lease termination damages, *before* the § 502(b)(6) statutory cap is applied. The Landlords note that even after the post-petition payments received are deducted, their total damages exceed the § 502(b)(6) limit. They therefore argue that the post-petition payments have no effect on their allowable lease termination claim, for their claim is allowable up to the full statutory limit. Response, Trust No. 10–34732–09, at 6–7; Response, Trust No. 50630, at 5–8. The Court agrees with the Landlords.

### 2. Discussion

█ It is well-settled that a security deposit held by a lessor on a rejected lease must be applied against the maximum claim for lease termination damages allowed to the lessor under § 502(b)(6). The legislative history of § 502(b)(6) unequivocally supports this treatment of security deposits. *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 353 (1977) (a lessor's "security deposit will be applied in satisfaction of the claim that is allowed under [§ 502(b)(6) ].") Furthermore, this treatment of security deposits is consistent with the security deposit's traditional function. A landlord is a secured creditor to the extent of any security deposit it holds. As a secured or partially secured creditor, the landlord must satisfy its claim against the lessee out of the security it holds before asserting a claim against the lessee's general assets.

█ In contrast, post-petition rent which a landlord receives from a tenant to whom the property has been relet is *not* applied in satisfaction of the landlord's maximum allowable claim under § 502(b)(6). Instead, such post-petition rent payments are deducted from the landlord's total actual lease termination damages, before the § 502(b)(6) cap is applied. *Goldblatt Bros.,* 66 B.R. at 347–48. The primary damage a landlord suffers upon termination of a lease is the loss of the future rental income the landlord expected to receive under the

terminated lease. The landlord can mitigate these damages by reletting the property. Any rent the landlord receives from the property's new tenant reduces the landlord's total actual lease termination damages.

■ The post-petition rent payments and post-petition use and occupancy payments which the Landlords received from the DIP and the Trustee in this case are somewhat analogous to post-petition rent payments received from a new tenant after reletting. The payments were made to compensate the Landlords for the DIP's and the Trustee's post-petition use of the Premises. These payments replaced the rental income the Landlords had anticipated receiving under the terminated Leases, thereby reducing the Landlords' total actual lease termination damages. The payments were *not* intended to provide security for the Landlords' claim against the Debtor. Therefore, the post-petition rent and post-petition use and occupancy payments should not be applied against the Landlords' maximum allowable lease termination claim under § 502(b)(6).

In support of his argument, the Trustee relies primarily on *In re First Alliance Corp.*, 126 B.R. 589 (Bankr.S.D.Cal.1991) and *In re Stewart's Properties, Inc.*, 41 B.R. 353 (Bankr.D.Hawaii 1984). These cases are not persuasive. The court in *Stewart's Properties*, for example, did reduce a lessor's maximum allowable lease termination claim by the amount of post-petition rent the lessor had received from the Chapter 7 trustee. However, the court did not explain why it did so. *See Stewart's Properties*, 41 B.R. at 355.

In addition, the court's reasoning in the *First Alliance* case is unconvincing. In *First Alliance*, the court held that money received as post-petition rent by a lessor on a rejected lease should be applied in satisfaction of the lessor's allowable claim under § 502(b)(6). The *First Alliance* court asserted that if post-petition rental payments were not deducted from the lessor's maximum allowable claim, a debtor who ceased payment of rent immediately upon filing a bankruptcy petition would be better

off than a debtor who continued to fulfill its rent obligations after filing. The court believed that such a result could not have been intended by the drafters of § 502(b)(6). *Id.* at 592.

Under § 365(d)(3) of the Bankruptcy Code, however, a debtor-in-possession or trustee who wishes to remain in possession of leased property after the filing of a bankruptcy petition must make post-petition rent payments. 11 U.S.C. § 365(d)(3); *In re Conston Corp., Inc.*, 130 B.R. 449, 453 (Bankr.E.D.Penn.1991). A vigilant landlord would probably be able to obtain relief from the automatic stay in order to enforce the debtor-in-possession's or trustee's obligation to pay. *Id.* at 453. Thus, contrary to the *First Alliance* court's suggestion, the added incentive of receiving a credit against the landlord's maximum allowable lease termination claim is not necessary to induce debtors to continue meeting their rent obligations after the filing of the bankruptcy petition.

C. *May the Landlords assert an administrative expense claim for physical damages to the Premises which occurred post-petition, and may they allocate their physical damage claims between pre-petition damages and administrative expenses based on periods of occupancy by the Debtor, the Debtor-in-Possession, and the Trustee?*

1. The Parties' Arguments

According to the Landlords, the Debtor's pre-petition failure to fulfill its repair and maintenance obligations is not the sole cause of the damage to the Premises. The Landlords assert that after the filing of the bankruptcy petition, the Debtor acting as Debtor-in-Possession, and later the Chapter 7 trustee, also caused damage to the Premises by failing to perform required maintenance and repairs. The Landlords therefore assert administrative expense claims for those portions of the damage to the Premises which occurred post-petition, during the administrative period.

The Landlords have apportioned their total claims for physical damages to the

Premises into pre-petition claims and administrative expense claims based upon the percentage of time the Premises were occupied before and after the bankruptcy filing. The LaSalle–Ridge property, for example, was occupied by the Debtor for approximately seven years, and by the DIP and the Chapter 7 trustee for approximately one year. LaSalle–Ridge has therefore asserted a pre-petition damage claim equal to 87.5% (7 years/8 years) of the total physical damage to the Premises, and an administrative expense claim equal to 12.5% (1 year/8 years) of total damages. Response, Trust No. 10–34732–09, at 10. Similarly, based upon the percentage of time attributable to pre-petition and post-petition occupancy of the LaSalle–North property, LaSalle–North has apportioned 74.6% of its total damage claim to pre-petition damages, and 25.4% of its total claim to administrative expenses. Response, Trust No. 50630, at 4.

The Trustee admits that under United States Supreme Court precedent, the Landlords may assert administrative expense claims for any damage to the Premises caused by the DIP's or the Trustee's negligence or willful and wanton misconduct. Trustee's Reply, at 9 (*citing Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968)). The Trustee challenges, however, the Landlords' assertion that damages resulting from the DIP's and the Trustee's failure to perform routine repair and maintenance give rise to administrative expense claims. The Trustee asserts that post-petition breaches of covenants, such as repair and maintenance covenants, in a pre-petition lease cannot give rise to administrative expense claims. The terms of a pre-petition lease are suspended upon the filing of a bankruptcy petition

until the lease is assumed or rejected. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). If the lease is ultimately rejected, as were the Leases in this case, the rejection is treated like a breach of the lease which occurred before the filing of the bankruptcy petition. 11 U.S.C. § 365(g). The Trustee therefore argues that a claim for damages for the breach of a covenant in a pre-petition lease must be considered a pre-petition damage claim rather than an administrative expense claim. Trustee's Reply, at 9.

### 2. Discussion

■ The Trustee is correct in asserting that the Leases, with their repair and maintenance covenants, were not technically in effect during the administrative period. However, § 365(d)(3) of the Bankruptcy Code requires that as a condition of continued use and occupancy of the property, a debtor-in-possession or trustee must perform all of the debtor's obligations under an unexpired lease until the lease is either assumed or rejected. Thus, the DIP and the Trustee in the instant case remained obligated to repair and maintain the Premises throughout the administrative period.[6]

■ The DIP's and the Trustee's failure to perform their post-petition repair and maintenance obligations gives rise to an administrative expense claim for any damages arising therefrom. The instant case is closely analogous to *In re United Trucking Service, Inc.*, 851 F.2d 159 (6th Cir. 1988), which also involved a damage claim arising from a lessee's post-petition continued use of leased property allegedly in violation of the pre-petition lease agreement.[7] In *United Trucking Service*, as in

---

6. Under § 365(d)(3), the trustee's obligation to perform the debtor's duties under an unexpired lease end when the lease is assumed or rejected. In the instant case, the Leases were rejected in July, 1990, when this Court denied the Trustee's Motion to Extend the Time to Assume or Reject the Leases. The Court authorized the Trustee, however, to continue to use and occupy the Premises until the middle of October, 1990. The right to continue to use and occupy the Premises must be considered to carry with it the obligation to continue performing the debtor's

duties under the lease. The Trustee therefore remained obligated to repair and maintain the premises at least through October 13, 1990.

7. The Trustee asserts that the *United Trucking Service* case is not relevant to the instant case because *United Trucking Service* involved a lease of personal property rather than real property. Trustee's Reply Memorandum, at 10 n. 5. The Court sees no significance in this distinction.

the instant case, a lessor asserted an administrative expense claim based on damage to the leased property caused by the lessee's post-petition failure to repair and maintain the property in accord with its lease obligations. The *United Trucking Service* court held that it was proper to treat these post-petition damage claims as administrative expenses. *United Trucking Service*, 851 F.2d at 162.

The court in *United Trucking Service* relied in part on *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2d Cir.1960). *American Anthracite* holds that the claim of a creditor having an executory contract with a debtor at the time of the debtor's bankruptcy petition is entitled to administrative expense priority if the debtor-in-possession or the trustee receives benefits under the executory contract. *American Anthracite*, 280 F.2d at 124. The purpose of granting priority in these cases is to prevent unjust enrichment to the debtor's estate. *Id.* at 126. The *United Trucking Service* court found that the debtor's estate had received benefits through its *breach* of the unexpired lease. The court noted that by breaching the lease's repair and maintenance covenants, the debtor's estate was able to use the money saved to continue its operations. *United Trucking Service*, 851 F.2d at 162. Since the breach had benefitted the bankruptcy estate, the Landlords' claim for damages for this breach was entitled to administrative expense priority. *Id.*

Similarly, the DIP and the Trustee in the instant case may have benefitted from their breaches of the repair and maintenance covenants. By failing to repair and maintain the Premises, the DIP and the Trustee may have spared the estate substantial amounts of money which could then have been used for other purposes, such as paying employees and trade vendors in an attempt to reorganize. Surreply of LaSalle National Bank, as Trustee Under Trust No. 10–34732–09 to Trustee's Objections, Supplemental Objection, Response to Proofs of Claim for Prepetition Damages and Administrative Expenses and Motion for Partial Summary Judgment, at

11. The Landlords' claims for damages for the breach of these covenants may therefore be asserted as administrative expense claims.

 However, the Landlords' apportionment of their total physical damage claims between pre-petition damages and administrative expenses based on the percentage of time the Premises were occupied before and after the bankruptcy petition is not permissible. Administrative expense claims receive priority over the claims of many other creditors. 11 U.S.C. § 507(a)(1). Administrative expense claims should therefore be narrowly construed in order to maximize the value of the estate for the benefit of other creditors. *United Trucking Service*, 851 F.2d at 164 (*citing Otte v. United States*, 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212 (1974)). Only the costs of remedying damages to the Premises which actually occurred after the filing of the bankruptcy petition may be treated as administrative expenses. *See United Trucking Service*, 851 F.2d at 164. An evidentiary hearing will be necessary in order to determine the extent, if any, of damages to the Premises which occurred post-petition.

### SUMMARY

1) The Landlords' pre-petition claims for physical damage to the Premises and for repair and maintenance expenses do not constitute claims for "future rent" or "lease termination damages" subject to the § 502(b)(6) statutory cap.

2) The Landlords' maximum allowable claim for lease termination damages, as computed under § 502(b)(6), should not be reduced by the amount of money the Landlords received from the DIP and the Trustee for post-petition rent and for post-petition use and occupancy of the Premises.

3) The Landlords may assert administrative expense claims for physical damage to the Premises which actually occurred post-petition. However, the Landlords may not allocate their damage claims between pre-petition damages and administrative expenses based on periods of occupancy by

the Debtor, the Debtor-in-Possession, and the Trustee.

## ORDER

This matter coming before the Court on the parties' cross-Motions for Partial Summary Judgment regarding the Trustee's Objections and Supplemental Objections to Proofs of Claim and Requests for Payment of Administrative Expenses of LaSalle National Bank as Trustee under Trust No. 50630 and as Trustee under Trust No. 10–34732–09 [Landlords], for the reasons set forth in the Memorandum Opinion of even date herewith, IT IS HEREBY ORDERED:

1) that the Landlords' pre-petitions claims for physical damages to the leased properties and for repair and maintenance expenses are not subject to the statutory cap of 11 U.S.C. § 502(b)(6);

2) that the Landlords' maximum allowable claim for lease termination damages, as computed under 11 U.S.C. § 502(b)(6), shall not be reduced by the post-petition rent and use and occupancy payments which the Landlords received from the Debtor-in-Possession and the Chapter 7 Trustee;

3) that the Landlords may assert administrative expense claims for the amount of physical damage, if any, caused to the leased properties after the filing of the bankruptcy petition; and

4) that the Landlords may not compute their administrative expense claims for post-petition damage to the leased properties by allocating their total physical damage claim according to the periods of occupancy by the Debtor, the Debtor-in-Possession, and the Chapter 7 Trustee.