**In re FOOD CITY, INC., Debtor.**

**Bankruptcy No. 88–51685.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Dec. 23, 1988.

---

See also, Bkrtcy., 94 B.R. 91.

Randolph N. Osherow, Thomas W. McKenzie, Kampmann & Church, San Antonio, Tex., for debtor.

Andrew E. Jillson, Jeffrey H. Weir II, Jenkins & Gilchrist, P.C., Dallas, Tex., for KP/Miller Realty Group Fund I.

David S. Gragg, Jeffers, Brook, Kreager & Gragg, Inc., San Antonio, Tex., for NCNB Texas Nat. Bank as successor to First Republic Bank—San Antonio, N.A.

Ben Steinhauser, Burns and O'Gorman, San Antonio, Tex., for Mendez Bros. Produce Co.

Bruce Waitz, Waitz, Greer, Harrell & Cennamo, San Antonio, Tex., for Official Unsecured Creditors' Committee.

## DECISION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

At San Antonio, Texas on the 10th day of November, 1988, came on for hearing the Application of K.P./Miller for payment of administrative expenses arising from breach of a covenant of a nonresidential real property lease, together with the Responses thereto by the debtor, the official creditors' committee, and NCNB–Texas National Bank. Upon consideration thereof, the court enters the following decision and order.

## BACKGROUND FACTS

KP/Miller Realty Growth Fund I ("KP Miller") leased a commercial site in a shopping center to Food City, the debtor in this case, for one of the debtor's discount grocery marts. The site comprised forty percent of the total leased space in the shopping center. According to KP Miller's representative, the grocery accounted for a substantial portion of the "traffic" throughout the center, one of the prime benefits to be gained by the landlord from renting the space to such a tenant as the debtor. KP Miller spent something in excess of $250,000 in tenant finish-out, as part of the inducement to Food City to lease the space. The lease was executed in December 1987.

Some seven months before, the previous tenant (another supermarket retailer) had moved out without warning. It built its own store less than a mile away, but prevented a competitor from moving into the

vacated space by holding the lease with continued monthly payments. In the process, it deprived the landlord of the traffic an active tenant would otherwise provide for the remainder of the center. KP Miller insists that it was this bitter experience which lead to the inclusion of a "going dark" clause in the current lease. This rather unusual provision levied a fee of $250,000 against the debtor if the debtor ceased to do business as a grocery store on the premises within the term of the lease.[1]

The debtor filed bankruptcy on or about June 3, 1988. Sixteen days later, on June 19, 1988, the debtor "went dark" at this location. The debtor took no steps to assume or reject the lease until nearly the end of the sixty day grace period provided in Section 365(d)(4).[2] The creditor, meanwhile, took no steps to enforce the terms of the "going dark" clause until July 28, 1988, when it filed its motion for immediate payment of administrative expenses. The lease was deemed rejected by operation of law on August 2, 1988.

KP Miller contends that the debtor failed to "timely perform" one of its obligations under the lease after the bankruptcy filing, namely, the obligation to continue operating a grocery store on the leased premises. As a result, it contends that the debtor has incurred an administrative claim of $250,-000 due to KP Miller. What is more, KP Miller adds that the fee is *immediately* due and payable, because the obligations imposed by this section of the Bankruptcy Code are independent of Section 503(b)(1), which otherwise regulates the allowance of administrative claims for the actual, necessary costs and expenses of preserving the estate. *See In re By–Rite Distributors, Inc.,* 47 B.R. 660 (Bankr.D.Utah 1985).

KP Miller relies heavily on Section 365(d)(3), which provides that

> The trustee shall *timely perform all the obligations of the debtor,* except those specified in section 365(b)(2), *arising from and after the order for relief under any unexpired lease of nonresidential real property,* until such lease is assumed or rejected, *notwithstanding section 503(b)(1)* of this title. . . .

11 U.S.C. § 365(d)(3) (emphasis added).

The debtor, the unsecured creditors' committee, and NCNB, the debtor's principal secured lender all oppose KP Miller's request.[3] They maintain that Section 365(d)(3) was never intended to apply to this sort of default. Even if it did, it would in any event not entitle the landlord to recover any more than state law would authorize and, under Texas law, such pen-

---

**1.** The provision reads as follows:

Tenant shall commence business operations in the leased premises on or immediately after the Commencement Date and shall operate its business in an efficient, high class and reputable manner so as to produce the maximum amount of sales from the leased premises. Tenant shall only operate in the entire leased premises the type of business . . . for which the leased premises are leased. In the event that the Tenant shall leave the leased premises vacant and shall not conduct and carry on in the entire leased premises the type of business [specified], Tenant must pay to Landlord (which fee is in addition to all other rights and remedies of Landlord) a fee for "going dark" as follows: (i) if the closing of the store on the leased premises occurs on or before the third anniversary of the date on which Tenant occupied the leased premises ("Occupancy Date"), the fee is $250,000 or if less, the actual amount paid to Tenant by Landlord pursuant to the Tenant Finish-out Allowance of even date herewith . . .

The parties agree that more than $250,000 was paid to the Tenant (or paid out for the benefit of the Tenant) in finish-out expenses, though there

was dispute over whether the funds were "advances" or "expenses incurred." The distinction is without a difference.

**2.** The section provides as follows:

Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4) (Bankr.L.Ed.1988).

**3.** The secured creditor would, in all likelihood, have to fund the payment of the expense if the court determines it is due immediately, as all of the debtor's current cash is encumbered by cash collateral orders, a simple reality which explains its alliance with the debtor and the unsecured creditors on this point.

alties are not enforced. Finally, they argue that, in any event, the debtor is not guilty of failure to "timely perform," because its liability under the lease would mature only upon the expiration of thirty days' notice of default. They point out that no notice was given, other than the filing of the motion for payment of administrative expense, and that thirty days after that motion's filing would place timely performance outside the sixty day period during which the duty imposed by Section 365(d)(3) applies.[4] For the reasons set out herein, this court finds the debtor's position (and the position of its allies) the more tenable and denies the requested relief.

## ANALYSIS

I. *The obligation in question was not the sort of obligation contemplated by Section 365(d)(3)*

■ The default in question does not appear to have arisen from the rejection of the lease, as it took place more than a month prior to the debtor's formal rejection of the lease. 11 U.S.C. § 365(g).[5] A debtor may decide to *neither* assume *nor* reject for a period of time, while it evaluates its options. During this "grace period," the general rule has been that the debtor will still be liable to the nondebtor party to the lease or executory contract for the value of the services or benefits derived therefrom, to the extent the services were reasonably necessary and to the extent of the benefit derived by the estate. *See In re By–Rite Distributing, Inc.*, 47 B.R. 660, 663–64 (Bankr.D.Utah 1985). Such claims have traditionally been accorded priority status as administrative claims arising under Section 503(b)(1). The claim was only allowed upon application, and was not paid until the time for distribution of assets. In a chapter 11 case, that generally did not occur until confirmation. 11 U.S.C. § 1129(a)(9)(A); 3 Collier on Bankruptcy, para. 503.02 at 503–5 (1987).

Section 365 was amended in response to intense lobbying by shopping center landlords who chafed under Section 502(b)(1)'s constraints. *In re By–Rite Distributors, Inc., supra.* At least two discrete problems were raised by that lobby and addressed by Congress in two separate provisions of Section 365(d).

First, there was the problem of long-term vacancy or partial occupancy. The landlord could not re-let the space until the lease was actually rejected, but the "dark" store hurt other tenants because of reduced customer traffic and the bad impression that a dark store makes. 130 Cong Rec S8894 (June 29, 1984) (remarks of Sen. Hatch). To remedy this problem, Congress enacted Section 365(d)(4), which forced the debtor to make a decision to assume or reject within sixty days or the lease would be rejected automatically and the debtor forced to surrender the premises to the landlord, if it had not already done so. *Id.;* 11 U.S.C. § 365(d)(4). In this way, Congress reallocated the relative burdens imposed by a tenant's "going dark" by limiting the landlord's exposure to sixty days. The harm to the landlord was *not* entirely eliminated, however, as landlords must bear part of the cost of bankruptcy just as must other creditors and the debtor.[6]

---

**4.** The obligation to perform expires upon the assumption or rejection of the lease in question. Section 365(d)(4) operates to reject the lease by operation of law if it is not affirmatively assumed within the sixty day period there specified (unless the sixty day period is extended— and it was not in this case). Thus, the duty to timely perform the lease's obligations would in all events have terminated in this case on August 2, 1988, just five days after the motion to pay administrative expenses was filed by KP Miller.

**5.** Section 502(g) accords the nondebtor party to an executory contract an allowed unsecured claim for claims arising from the rejection of such a contract, including the deemed rejection that results from failing to timely assume an unexpired nonresidential lease. 11 U.S.C. § 502(g). The court need not and does not reach this issue on the merits at this time.

**6.** Congress contemplated that a landlord might well have to suffer sixty days worth of vacancy as part of the shared burden of bankruptcy. 130 Cong Rec S8894 (June 29, 1984) (remarks of Sen. Hatch) ("The bill would *lessen* the problems caused by extended vacancies ..."). If more immediate relief is needed, a landlord in KP Miller's position could always move for *immediate* rejection of the lease under Section 365(d)(2) and ask for an expedited hearing, in

Section 365(d)(3) was enacted to address a different problem, that of a landlord's having to "carry" the cost of the tenant's occupancy, often at the expense of other tenants.

> A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide *current* services—the use of its property, utilities, security, and other services—without *current* payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

*Id.* (emphasis added). To meet this problem, Section 365(d)(3) requires the trustee to maintain these "current" obligations:

> The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property *at the time required* in the lease. This *timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.*

*Id.* (emphasis added); 11 U.S.C. § 365(d)(3).[7] The clear intent is thus to assure that landlords not be compelled to furnish current services without being compensated on a current basis.[8]

The use in the statute of the phrase "all obligations" must be read against the backdrop of the legislative history, which did not purport to confer a windfall on landlords but merely to protect them from bearing too much of the burden incident to the process of assumption/rejection.

KP Miller, however, arguing that the phrase must be given a literal interpretation, contends that Food City's obligation was to pay KP Miller $250,000 when it moved out. That interpretation does not square well either with a fair reading of the lease or with a fair reading of the statute as a whole.

First of all, the "obligation" in question is not to pay the fee, but to keep the store open, i.e., not to "go dark." It was that obligation which, when breached, raised the issue of the charge.[9] The fee itself is merely the *remedy* for failure to perform, i.e., for not keeping the store open and operating. In this regard, the "going dark" fee differs fundamentally from other rights to payment under the lease. Rents, for example, are not a remedy for breach of an obligation. They *are* the obligation. The same is true for such other items as common area maintenance charges, utilities, and even taxes. *See* 130 Cong Rec S8994–95 (daily ed. June 29, 1984) (remarks of Sen. Hatch) ("this timely performance

---

an effort to mitigate its damages suffered as a result of the breach of its "going dark" provision. *See* Bankr.R. 9006. It might also conceivably seek relief from the automatic stay. *In re DeSantis*, 66 B.R. 998, 1001 (Bankr.E.D.Pa. 1986).

7. The debtor can obtain a reprieve from paying these current obligations immediately, though the reprieve is only good for the first sixty days, after which they must be paid on a current basis. 130 Cong Rec S8894 (June 29, 1984) (remarks of Sen. Hatch). No such reprieve was sought in this case.

8. It was apparently the one-sidedness of excusing one party's performance while holding the other party to continued performance that of-

fended Congress. Such a result is out of keeping with the very definition of an executory contract, under which a failure to perform by one party is said to *excuse* performance by the other party. *See* V. Countryman, "Executory Contracts in Bankruptcy," 58 Minn.L.Rev. 479, 502 (1974). If a debtor is going to be able to insist on continued use of leasehold premises, that debtor should be prepared to pay for that use on a current basis.

9. The charge itself was also, of course, an obligation once assessed, but not one that was reasonably incident to continued performance. The focus of Section 365(d)(3) is on mutual obligations of the sort the failure of which will excuse the other party from further performance.

requirement will insure that debtor-tenants pay their rent, common area and other charges on time ...". Section 365(d)(3) may compel timely performance of obligations due under the lease, such as the obligation to pay rent. It does not, in this court's view, compel the timely payment of the default remedy for failure to timely perform an obligation due under the lease, such as the obligation to keep the store open.

The obligation not to go dark is not a proper subject for Section 365(d)(3) in any event.[10] In fact, the problem of early vacancy is already addressed far more efficiently by Section 365(d)(4), which returns the premises to the landlord within 60 days after the bankruptcy filing. There is no need to look to Section 365(d)(3) for further remedy to the problem and to do so only confers a benefit on landlords never intended by Congress.[11]

Even were the obligation in question to be in fact the obligation to pay the "going dark" fee, Section 365(d)(3) does not purport to encompass such a fee within its directive that the trustee timely perform all the obligations of the debtor. *See* footnote 10, *supra.* Virtually every case which has ever applied this statute (including every case cited by KP Miller in its brief) has done so in the context of *current* obligations such as rent, common area maintenance charges, trash pick-up and the like. *In re Rare Coin Galleries of America,* *Inc.,* 72 B.R. 415, 416 (D.Mass.1987) (rent and trash pick-up); *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 972 (Bankr.E.D.Pa.1987) (rents); *In re DeSantis,* 66 B.R. 998, 1004–05 (Bankr.E. D.Pa.1986) (rents); *In re Coastal Dry Dock & Repair Corp.,* 62 B.R. 879, 882–83 (Bankr.E.D.N.Y.1986) (rents and utility charges); *Matter of Lonqua,* 58 B.R. 503, 505 (Bankr.W.D.Wis.1986) (rents). None of these cases authorized recovery of liquidated damages, penalties, or other extraordinary fees. This court does not believe that Congress ever intended the word "all" to be read so literally that it would include such charges as this "going dark" fee simply because the charge serendipitously arises during the sixty day grace period preceding the deadline for assumption or rejection.[12]

II. *The debtor was not obligated under Section 365(d)(3) because timely performance of the obligation was not required within the 60 day period contemplated under that section*

 Even if KP Miller were right in its interpretation of Section 365(d)(3), it is wrong in application of its salutary provisions to the facts of this case, for the default in question did not become an obligation of the estate until August 28, 1988, thirty days after the first writing which could be considered a notice of default un-

**10.** The obligation to continue operations does not fit well within the statutory framework of Section 365(d)(3). For example, "[t]he court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief...." 11 U.S.C. § 365(d)(3). It is difficult to conceive what such an extension would mean in the context of a debtor such as Food City desiring to *cease* operations immediately. In fact, the "going dark" provision is more properly characterized as a negative covenant than an affirmative obligation. It makes no sense to talk of "timely performance" of negative covenants.

**11.** A thing may be within the letter of a statute and yet not within that statute because not within its spirit nor within the intention of its makers. *California Federal Savings & Loan Assoc. v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981); *United Steelworkers of America, et al. v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

**12.** Indeed, KP Miller's interpretation would tend to undercut the grace period which Section 365(d)(4) grants the estate for deciding whether to assume or reject. To avoid having to pay a huge charge as an immediate administrative expense under Section 365(d)(3), the trustee would be forced to reject the lease *immediately.* Such an interpretation would encourage landlords to insert "poison pills" in their leases to force just such precipitous rejections, a result entirely inconsistent with the spirit of the Bankruptcy Code. One part of a statute should not be interpreted in a fashion which would undermine other portions of the same statute. *United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

der the lease. The lease specifically accords the debtor thirty days within which to cure any breach of a covenant under the lease, one of which is the covenant not to "go dark." [13] Under Section 365(d)(3), the trustee is obligated to *timely* perform the obligation of the *debtor*. Timely performance in this case would not have been triggered until the notice was sent.

KP Miller argues that the automatic stay prevented the landlord from giving notice under the lease.[14] Arguably, the automatic stay should not prevent a landlord from enforcing a post-petition obligation of the trustee that arises under the Bankruptcy Code itself.[15] By virtue of Section 365(d)(3), the current obligations of the debtor are imposed upon the trustee. A number of courts have acknowledged that the section is disquietingly silent about the remedies available to the landlord when the debtor does *not* timely perform these obligations. *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 973 (Bankr.E.D.Pa.1987); *In re Compass Van & Storage Corp.*, 61 B.R. 230, 233 n. 4 (Bankr.E.D.N.Y.1986); *In re Musikahn*, 57 B.R. 942, 945 (Bankr.E.D.N.Y.1986); *In re Southwest Aircraft Services, Inc.*, 53 B.R. 805, 808 (Bankr.C.D.Cal.1985). The landlord's caution is understandable, in view of the substantial damages which can accrue from a violation of the stay. *See* 11 U.S.C. § 362(h); *see generally* Comment, *Monetary Awards to the Debtor for Violations of the Automatic Stay*, 11 Fla.S.U.L.Rev. 423 (Summer 1983).

Caution does not translate into excuse, however. Cases in this area suggest a number of ways in which the matter could have been brought to a head, for example, by filing a motion for relief from stay, as was done in *Compass Van & Storage Corp.*, or by filing a motion to compel performance under Section 365(d)(3), as the landlord did in *Dieckhaus Stationers*. As it was, KP Miller took no such action until nearly the end of the sixty-day grace period. Under the exact terms of the lease (and it is KP Miller which so strenuously insists on the lease's *exact* terms), the Debtor had thirty days after notice, and until the expiration of that grace period, was excused from performance. The first "written notice" was KP Miller's application, filed July 28, 1988. Thirty days expired at a point in time which all agree was well *after* the lease was rejected by operation of law. Section 365(d)(3) does not apply to the payment of the "going dark" penalty under the facts of this case.

KP Miller counters that the fee was in fact *due* immediately upon the debtor's go-

---

**13.** The applicable default provision reads as follows:

The following events shall be deemed to be events of default by Tenant under this lease:

. . . . .

(b) Tenant shall fail to comply with any term, provision or covenant of this lease, other than as described in subsection (a) above [relating to rental obligations], and shall not cure such failure within thirty (30) days after written notice thereof to Tenant.

The applicable remedy provision reads as follows:

Upon occurrence of any such events of default, Landlord may enforce the performance of such defaulted covenant in any manner provided by law, and/or may declare this lease forfeited at Landlord's discretion, and/or Landlord, or his agents or attorneys, shall have the right, without further notice or demand, to re-enter and remove all persons therefrom without being deemed guilty of any manner of trespass, and without prejudice to any remedies for arrears of rent or breach of covenants, or the Landlord, or Landlord's agent or attorney, may resume possession of the leased premises, and relet the same for the remainder of the term, at the rent it may obtain for the account of the Tenant who shall make good any deficiency of all rents.

**14.** KP Miller's representative acknowledged that, on the advice of counsel, she did not send the notice letter contemplated by the default portion of the lease, evidently fearing a violation of the automatic stay.

**15.** *See In re S. & F. Concession, Inc.*, 55 B.R. 689, 691 (Bankr.E.D.Pa.1985) ("the clear language of § 365(d)(3) mandates that the trustee immediately pay all postpetition rent and remain current on future rent payments as they come due"); *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 973 (Bankr.E.D.Pa. 1987) ("I conclude that a ...claim arising under section 365(d)(3) should be paid immediately unless the trustee establishes good cause for withholding the payment"); *In re M.H.I., Inc.*, 61 B.R. 69, 70 (Bankr.D.Md.1986) ("§ 365(d)(3) carries with it a mandatory direction to maintain lease payments until the lease is rejected").

ing dark, noting for support how important it was to KP Miller to prevent a repeat of its experience with a previous grocer at this location. Such a close reading of the "going dark" clause would cut off any chance to cure the default, rendering nugatory the default and cure provisions of the lease. In construing a contract, a court should arrive at that interpretation which most harmoniously gives effect to all of its substantive terms. *Deaville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183 (5th Cir.1985); *R.C. Small & Assoc., Inc. v. Southern Mechanical, Inc.*, 730 S.W.2d 100 (Tex.App.—Dallas 1987, no writ); *Seaman v. Seaman*, 686 S.W.2d 206 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The generic default provision is not overridden by any more specific default terms in the "going dark" clause itself. A fair reading of both clauses together leads to the conclusion that KP Miller could not have successfully collected the "going dark" fee in a nonbankruptcy setting until the debtor had been afforded the opportunity to cure the default. There is no reason to give the word "due" any different reading in the bankruptcy context.

The real function of the "going dark" fee was to *discourage* the very thing that happened. Once it happened, the fee was proved to be ineffective as a deterrent, much as security interests often fail as deterrents to default. We do not grant immediate relief from stay to secured creditors solely on a showing that the debtor defaulted. We should be no more solicitous of this landlord, especially as the statute already treats landlords of nonresidential real property far more favorably than it treats secured creditors of the debtor. *Compare* 11 U.S.C. § 365(d)(4) *with* 11 U.S.C. § 362(d)(2)(B) and *United Savings Association of Houston, Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365,

108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The leasehold premises were returned to KP Miller just sixty days after filing, far sooner than most secured creditors recover their collateral in a bankruptcy case of this size and complexity.[16]

### III. The damages sought in any event are not compensable under state law because they are liquidated damages in the nature of a penalty

The Debtor, the Creditors' Committee, and NCNB all argue that the "going dark" fee is not recoverable in any event, as it represents a penalty which could not be enforced under Texas law. *See Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484 (1952); *Community Development Service, Inc. v. Replacement Parts Manufacturing, Inc.*, 679 S.W.2d 721 (Tex.App.—Houston [1st Dist] 1984, no writ). While there may be merit to that position, the court need not address the issue at this time, as it has already concluded that the "going dark" fee cannot be recovered under the authority of Section 365(d)(3). The testimony does indeed suggest, however, that the damages which KP Miller alleges it suffered as a result of the closing of Food City's store flow from the loss of traffic at the center, and not the cost of the tenant finish-out. The testimony also strongly indicates that the fee's function was to induce specific performance with the threat of a costly penalty in the event of a breach. If the fee is indeed a penalty, it may be recovered only to the extent KP Miller proves its *actual damages* flowing from the closing. *See Community Development Services, Inc. v. Replacement Parts Manufacturing, Inc., supra.* In any event, the fee will be an allowed administrative expense only to the extent it represents an actual, necessary cost or expense of preserving the estate. 11 U.S.C. § 503(b)(1)(A).[17]

**16.** KP Miller also notes that it actually expended more than $250,000 to finish out the store, and that the "going dark" fee was intended to approximate recovery of that cost. Had Food City not moved out, however, KP Miller would have no doubt gladly absorbed that cost. Had Food City elected to assume the lease after "going dark," it arguably could have escaped paying the fee, notwithstanding its obligation to cure out-

standing defaults, on grounds that the fee is a penalty not recoverable under Texas law. *See Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484 (1952).

**17.** The claim may even turn out to be a claim arising from termination of the lease, or a claim arising from the rejection of the lease. *See* 11 U.S.C. §§ 365(g), 502(b)(6), 502(g). The court

It is therefore ORDERED, ADJUDGED, and DECREED that the application of KP Miller to recover the "going dark" fee of $250,000 under Section 365(d)(3) be and the same is hereby denied. The claim is disallowed as a claim under Section 365(d)(3), without prejudice to refiling. The Debtor is ORDERED, however, to pay KP Miller, the remaining charges sought in its motion, consisting of two months' rent (including late charges), common area maintenance charges, utilities, and the like, within ten (10) days of the effective date of this order. This order does not constitute either allowance or disallowance of KP Miller's claim under Sections 503(b)(1)(A), 502(g), or 502(b)(6).

See also, Bkrtcy., 93 B.R. 526.

reserves this question until such time as the claim is subjected to the appropriate claims allowance process.