**In re R.H. MACY & CO., INC. et al., Debtors.**

**Bankruptcy No. 92 B 40477 (BRL).**

United States Bankruptcy Court, S.D. New York.

July 7, 1994.

000 in damages arose as a consequence of the Debtor's failure to operate the La Mesa Store under the trade name "Bullock's" from April 19 through December 17, 1993, during which period the Debtor conducted a court-approved store closing sale and engaged in an unsuccessful effort to sell its leasehold interest. Grossmont contends that such damages must be timely paid under § 365(d)(3) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1988), (the "Code"), or, in the alternative, qualify as administrative expenses pursuant to § 503(b) of the Code.[1]

The Debtor has responded by moving to dismiss Grossmont's motion under Federal Rules of Bankruptcy Procedure 9014 and 7012 on the ground that Grossmont's motion fails to state a claim upon which relief can be granted. It is well settled that Grossmont's motion will not be dismissed, " 'unless it appears beyond doubt that the [movant] can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1171–72 (2d Cir.1994) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). For the purpose of this motion, Grossmont's well plead factual allegations are accepted as true. *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (citations omitted).

Section 6–A of the Lease provides that the Debtor must continuously operate, subject to certain exceptions, a store under the trade name "Bullock's" during the first 15 years of the Lease (the "Covenant to Stay Open" or "Covenant"). Grossmont asserts that the Debtor paid a relatively low rent because it operated an anchor store which drew customers to the shopping center. In January 1992, four years after assuming the Lease and ten years after the Lease was originally executed by Grossmont and the Debtor's predecessor-in-interest, the Debtor filed its Chapter 11 petition.

In March 1992, the Debtor's time to assume or reject certain leases for nonresidential real property, including the Lease for the La Mesa Store, was extended until the con-

Weil, Gotshal & Manges by Richard Krasnow, Beth Rosen, New York City, for debtors.

Winston & Strawn by Cory Friedman, New York City, for Grossmont Shopping Center Co.

Otterbourg, Steindler, Houston & Rosen, P.C. by Debra Sudock, New York City, for Official Committee of Unsecured Creditors.

*Memorandum Decision on Debtor's Motion to Dismiss Lessor's Motion for Payment of Administrative Expenses*

BURTON R. LIFLAND, Chief Judge.

## I. INTRODUCTION

Grossmont Shopping Center Company, ("Grossmont"), alleges that Bullock's Properties Corporation, a subsidiary of R.H. Macy & Co., Inc., ("Debtor"), breached a lease for nonresidential real property (the "Lease") located at the Grossmont Shopping Center in La Mesa, California (the "La Mesa Store"). Grossmont asserts that approximately $970,-

---

1. Although Grossmont has filed a proof of claim which appears to include certain sums sought in the instant motion, the motion does not raise any issues with respect to the allowance of a lessor's claim under § 502(b)(6) of the Code.

firmation of a plan or plans of reorganization. In March 1993, the Debtor sought authorization to conduct a store closing sale at the La Mesa Store in connection with its decision to cease operations and maximize the value of estate assets at this location. Grossmont objected. The Court approved the store closing sale, and addressing Grossmont's concern that its shopping center would be burdened by an anchor store which had "gone dark," directed that the Lease be deemed rejected on November 1, 1993 unless there was a prior assumption and assignment of such Lease. Grossmont alleges that the Debtor ceased operating the La Mesa Store under the name "Bullock's" on April 19, 1993, and conducted the store closing sale under the trade name "Grand Finale" until July 6, 1993.

In October 1993, the Debtor, asserting that a potential purchaser of the Lease required additional time to conduct its due diligence review, sought to extend its time to assume or reject the Lease to March 31, 1994. Grossmont opposed this motion. The Court denied the Debtor's request and set a December 16, 1993 deadline for the assumption or rejection of the Lease. The Debtor's marketing efforts to sell the Lease were unsuccessful, and the Lease, by Order dated December 17, 1993, was deemed rejected on December 15, 1993.

There is no dispute that at all times pending the December 1993 rejection of the Lease the Debtor paid all rent due under the Lease. Grossmont alleges that the Debtor ceased operating the La Mesa Store on April 19,

thereby breaching the Covenant to Stay Open and requiring timely payment of damages under § 365(d)(3) of the Code. Grossmont argues in the alternative that such damages qualify as an administrative expense pursuant to § 503(b)(1)(A). While the Debtor disputes that it breached the lease and that approximately $970,000 in damages resulted from this breach, it moves to dismiss Grossmont's motion on the grounds that any damages awarded would not be timely paid under § 365(d)(3) and do not qualify as an expense of administering the Debtor's estate. It is assumed for the purpose of the § 365(d)(3) discussion that the Covenant is enforceable. In ruling on the § 503(b) request for relief it is necessary to review whether the Covenant to Stay Open is enforceable against the Debtor.

## II. SECTION 365(d)(3)

■ Section 365(d)(3) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from ... any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." As it appears that damages for a breach of a covenant which qualify as a contractual obligation under § 365(d)(3) must be timely paid, *In re Atlantic Container Corp.* 133 B.R. 980, 991 (Bankr.N.D.Ill.1991), Grossmont argues that the Covenant to Stay Open qualifies as an obligation under § 365(d)(3).[2]

---

**2.** In light of the following discussion, the Court need not address the Debtor's argument that the Covenant cannot be considered an obligation under § 365(d)(3) because Grossmont, under applicable California law, could not obtain an injunction requiring the Debtor to continue operations under the Lease. *See* Cal.Civ.Proc.Code § 526(b)(5) (West 1994) ("An injunction cannot be granted ... [t]o prevent the breach of a contract the performance of which would not be specifically enforced."); *Long Beach Drug Co. v. United Drug Co.,* 13 Cal.2d 158, 171, 88 P.2d 698, 705 (Cal.1939) ("Courts ... only decree specific performance where the subject-matter ... is capable of being embraced in one order and is immediately enforceable[,] ... not ... when the duty to be performed is a continuous one, extending possibly over a long period of time and ... will necessarily require constant

... oversight ... by the court.") (citations omitted); *Whipple Road Quarry Co. v. L.C. Smith Co.,* 114 Cal.App.2d 214, 216, 249 P.2d 854, 855 (Cal.Dist.Ct.App.1952) (Court would not grant an injunction requiring lessee to operate property as a commercial quarry, as required by lease, because "courts of equity will not decree the specific performance of contracts which by their terms ... require protracted supervision.") (internal quotations omitted). However, a lessor is entitled to recover damages as a remedy for breach of contract under California law. *See Long Beach Drug Co. v. United Drug Co.,* 13 Cal.2d 158, 173, 89 P.2d 386, 387 (Cal.1939) ("Although the equitable remedy is not available to plaintiff, nevertheless the contract sued upon is valid and sufficiently certain to warrant ... a plea for the recovery of damages."); *Lippman v. Sears, Roebuck & Co.,* 44 Cal.2d 136, 146, 280 P.2d 775,

Yet the issue is not simply whether the Covenant to Stay Open is an obligation under the Lease, nor whether it is an obligation which is theoretically susceptible to mandatory timely performance. *See* 11 U.S.C. § 365(d)(3) ("[t]he trustee *shall* timely perform all the obligations of the debtor") (emphasis added). The Court must determine whether the Covenant to Stay Open is an obligation which must be timely performed in concert with the Debtor's obligation to maximize estate assets for the benefit of all parties in interest. *Cf. BFP v. RTC*, ⸺ U.S. ⸺, ⸺–⸺, 114 S.Ct. 1757, 1769–70, 128 L.Ed.2d 556 (1994) (meaning of § 548(a)(2)(A)'s "reasonably equivalent value" determined in light of mortgage foreclosure proceeding's effect on real property's value). For even within the fluctuating walls of the "plain meaning" fortress, *see 680 Fifth Ave. Assocs. v. Mutual Benefit Life Ins. Co. (In re 680 Fifth Ave. Assocs.)*, 156 B.R. 726, 734 n. 12 (Bankr.S.D.N.Y.1993) (noting "that the Supreme Court has redefined its support of the plain meaning rule in recent cases involving bankruptcy issues") (citation omitted), *aff'd*, 169 B.R. 22 (S.D.N.Y.1993); Walter A. Effross, *Grammarians at the Gate: The Rehnquist Court's Evolving "Plain Meaning" Approach to Bankruptcy Jurisprudence*, 23 Seton Hall L.Rev. 1636 (1993) (setting forth "internal ambiguities of the 'plain meaning' approach"), a court should not resolve questions of statutory interpretation so that a particular Bankruptcy Code section conflicts and disturbs the overall purpose and function of the Code. *See Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.") (citations omitted); *cf. Rake v. Wade*, ⸺ U.S. ⸺, ⸺, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424 (1993) (construing §§ 506(b) & 1322(b)(5) together, and stating that "[w]e generally avoid construing one provision in a statute so as to suspend or supersede another provision.") While "[t]he starting point in any case involving construction of a statute is the language itself[,]" *St. Paul Fire and Marine Ins. Co. v. Barry*, 438 U.S. 531, 541, 98 S.Ct. 2923, 2929, 57 L.Ed.2d 932 (1978) (citation omitted), and "where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms[,]'" *United States v. Ron Pair Enters.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) (citation omitted), courts must be wary not to examine one section of a statute in isolation because "[s]tatutory construction ... is a holistic endeavor." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *cf. Railway Labor Executives Ass'n v. I.C.C.*, 735 F.2d 691, 700 (2d Cir.1984) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'.") (Friendly, J.) (quoting *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940) (Reed, J.)); *680 Fifth Ave.*, 156 B.R. at 734 n. 12 (noting that "in *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991), the Supreme Court unanimously construed a 'claim' in bankruptcy according to the 'text, history, and purpose of the Bankruptcy Code' without an initial determination that the Code's definition of a claim was ambiguous.")

As noted by Grossmont, this Court had the opportunity to consider the meaning of the term "obligation" in *In re R.H. Macy & Co.*, 152 B.R. 869, 873 (Bankr.S.D.N.Y.1993), *aff'd*, No. 93 Civ. 4414, 1994 WL 482948 (S.D.N.Y. Feb. 24, 1994) ("*Macy's I*"). In *Macy's I*, the lease in question provided that the debtor was responsible for the payment of certain property taxes. After the taxing authority conducted a post-petition reassessment which solely related to taxes that accrued during the prepetition period, the lessor forwarded the tax bill to the debtor. This Court concluded, with respect to facts then before it, that the term "obligation" was

781 (Cal.1955) (lessor entitled to damages for lessee's breach of implied covenant to remain in business).

clear and unambiguous and encompassed the lease's covenant requiring the debtor to pay the property taxes. In this fashion, *Macy's I* is consonant with those decisions which require timely payment of rent, common area maintenance and other charges under an unrejected lease for nonresidential real property.

The bankruptcy cases cited by Grossmont belong to this line of authority as they address these types of lessee obligations. *See Atlantic Container,* 133 B.R. at 991 (failure to maintain and repair leased premises); *In re Dieckhaus Stationers, Inc.,* 73 B.R. 969, 971 (Bankr.E.D.Pa.1987) (failure to make post-petition payments for the use and occupancy of the premises); *In re Rare Coin Galleries, Inc.,* 72 B.R. 415, 416 (D.Mass. 1987) (rent and trash pickup); *In re Borbidge,* 66 B.R. 998, 1004 (Bankr.E.D.Pa.1986) (rent); *International Coins & Currency, Inc. v. Barmar Corp. (In re International Coins & Currency, Inc.),* 18 B.R. 335, 338 (Bankr. D.Vt.1982) (administrative priority for damages in excess of normal wear and tear). In each of these cases, a debtor used the premises but did not timely satisfy its rental obligations or repair and maintain the physical property in accordance with the lease. In this instance it is not disputed that the Debtor timely paid rent and properly maintained the physical premises pending rejection of the Lease.

■ Although Grossmont places its faith in selected excerpts from *Macy's I* and the District Court's affirmance, it fails to note that the issue in that case was the distinction between the term "claim," which is defined in § 101 of the Code and is not found in § 365(d)(3), and the term "obligation" which is not defined by the Code. This Court looked to *Black's Law Dictionary* for a definition of the term "obligation" because "[c]ourts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs. v. Brunswick Assoc. Ltd.,* —— U.S. ——, ——, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979));

*see Macy's I,* 152 B.R. at 873. While *Black's* defines the term "obligation," in part, as "[t]hat which a person is bound to do or forbear[,]" this phrase is expressly prefaced by the statement that the word "obligation" is "[a] generic word ... having many, wide, and varied meanings, according to the context in which it is used." *Black's Law Dictionary* 1074 (6th ed. 1990). Thus, *Macy's I* does not stand for the proposition that each and every lease covenant which could conceivably be pigeon-holed into the term "obligation" qualifies as a § 365(d)(3) obligation which must be timely performed pending assumption or rejection. *Cf. Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (Hand, J.) ("[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.")

■ It is patently unclear how the Covenant to Stay Open, as opposed to a requirement to pay rent each month, could be an obligation which *must* be timely performed by a debtor in possession which has an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors. *Cf. NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984) ("the policy of Chapter 11 is to permit successful rehabilitation of debtors"). The debtor's duty to maximize estate assets may require, as it did here, the cessation of operations at one location. *Cf. United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.'") (citation omitted). Section 363(b) of the Code provides the authority to conduct a store closing sale as a debtor may, after notice and a hearing, use property of the estate "other than in the ordinary course of business." *See In re Ames Dep't Stores, Inc.,* 136 B.R. 357, 359 (Bankr.S.D.N.Y.1992). After operations cease, a debtor's estate may continue to hold a valuable leasehold interest,

and it is a debtor's duty to attempt to monetize this asset. The lessor, as in this case, receives timely rent payments pending the debtor's decision to assume or reject. 11 U.S.C. § 365(d)(3). This scenario is entirely consistent with the aforementioned Bankruptcy Code policies which would be contravened and frustrated if the Debtor were required to timely perform the Covenant to Stay Open, regardless of its effect on the Debtor's ability to successfully reorganize for the benefit of all of its creditors. *Cf. Young v. Higbee Co.*, 324 U.S. 204, 210, 65 S.Ct. 594, 597, 89 L.Ed. 890 (1945) ("historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets").

To accept Grossmont's argument would be to conclude that § 365(d)(3), in conjunction with a covenant to continue operations, penalizes a debtor for ceasing business at unprofitable locations because this section would mandate the timely payment of damages which allegedly flow from this business decision. *See In re Food City, Inc.*, 95 B.R. 451, 456 n. 10 (Bankr.W.D.Tex.1988) ("[t]he obligation to continue operations does not fit well within the statutory framework of Section 365(d)(3)"). In accordance with Grossmont's reasoning, a debtor would be unable to receive the full value of its leasehold interest in the context of its assumption and assignment to a third party, pursuant to § 365(b), because the debtor would be required to continuously operate the property, presumably at a loss, pending the closing of this transaction.

Reading § 365(b) in concert with § 365(d)(3) also reveals that § 365(d)(3) does not require the Debtor to timely pay damages for breaches of all lease covenants. *Cf. Rake*, —— U.S. at ——, 113 S.Ct. at 2187 (construing § 506(b) in light of section § 1322(b)(5)); *United States Brass & Copper Co. v. Caplan (In re Century Brass Prods., Inc.)*, 22 F.3d 37, 39 (2d Cir.1994) (holding that § 546(a)'s two year statute of limitations, in view of a debtor in possession's rights and obligations under § 1107(a), applies to a debtor in possession). In the context of an assumption of a lease, § 365(b)(1) requires a debtor to compensate, or provide

adequate assurance of compensation, "for any actual pecuniary loss" to the lessor which results from a default under the lease. If § 365(d)(3) required timely payment of all damages for breaches of all covenants under a lease, § 365(b)(1) would be superfluous because there would be little need to remedy "actual pecuniary loss" as the landlord would already have received current damage payments under § 365(d)(3).

Application of the method of statutory analysis adopted by the Supreme Court in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), further indicates that § 365(d)(3) does not require timely payment of damages for a breach of a covenant to continue operations. In *Dewsnup*, the Supreme Court explained that it "has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." *Id.* at ——, 112 S.Ct. at 779 (citations omitted). Here the question is whether the addition of § 365(d)(3) to the Code through the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (July 10, 1984) ("BAFJA"), caused a "major change" with respect to pre-Code and pre-BAFJA practice with respect to the treatment of a lessor's post-petition claims under its lease.

Prior to BAFJA's amendment of § 365, under both the former Bankruptcy Act and the Bankruptcy Code, lessors of real property were not entitled to the timely payment of rent reserved under a lease, but "the estate was liable for the reasonable value of the use and occupancy of the premises." *In re By-Rite Distrib., Inc.*, 47 B.R. 660, 664 (Bankr. D.Utah 1985); *see also Crocker v. Chakos (In re Chakos)*, 24 F.2d 482, 486 (7th Cir.1928) (landlord submitted claim for post-petition value of trustee's use and occupancy of premises). The lessor's claim for use and occupancy was accorded priority status under § 64(a)(1) of the Bankruptcy Act, 11 U.S.C. § 104(a) (repealed); *S. & W Holding Co. v. Kuriansky*, 317 F.2d 666, 668 (2d Cir.1963); *City of Fort Lauderdale v. Freeman*, 217

F.2d 600, 602 (5th Cir.1954), and pursuant to § 503(b)(1) of the Code. *Food City,* 95 B.R. at 454. A difficulty for lessors in chapter 11 cases was that their administrative claims were often only paid upon confirmation of a plan of reorganization. *Food City,* 95 B.R. at 454. A significant problem during the period in which the trustee was marketing the debtor's leasehold interest after the premises had been vacated was that "the trustee stopped paying rent while the landlord was forced to provide current services." *In re Wingspread Corp.,* 116 B.R. 915, 926 (Bankr.S.D.N.Y. 1990).

In 1984, § 365(d)(3) was added to the Code, as the remarks of Senator Hatch indicate, to "requir[e] the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease." 130 Cong.Rec. S8894, S8895 (daily ed. June 29, 1984); *see also Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 199 (2d Cir.1986). In this fashion, § 365(d)(3) dramatically altered the treatment of a lessor of nonresidential real property's post-petition claim and thus effected a "major change" from pre-Code and prior Code practice. *See By–Rite,* 47 B.R. at 663 ("Section 365 of the Bankruptcy Code was substantially rewritten by the Bankruptcy Amendments and Federal Judgeship Act of 1984.") (citations omitted). As there is no indication in § 365(d)(3)'s legislative history that a damage claim which arises as a result of a breach of a covenant to continue operations must be timely paid, application of the foregoing *Dewsnup* methodology indicates that § 365(d)(3) does not mandate timely payment of such claim. Therefore, because the Covenant does not qualify as an obligation under § 365(d)(3), the Debtor's motion to dismiss is granted with respect to Grossmont's motion for damages under section 365(d)(3) of the Code.

### III. SECTION 503(b)

■ Grossmont asserts that the consequential damages which stem from the Debt-

or's alleged breach of the Lease's Covenant to Stay Open qualify as expenses of the Debtor's estate pursuant to § 503(b)(1)(A) of the Code. This section provides, in pertinent part, that administrative expense status is granted to "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case[.]" Viewing Grossmont's motion and supporting papers in a light most favorable to it, the Debtor has demonstrated that Grossmont will be unable to present a set of facts at trial which would allow Grossmont to demonstrate that its damage claim would be entitled to administrative priority.

It is well settled that claims for "administrative expense priority should be narrowly construed to include only those creditors that perform services that are actual and necessary to preserve the bankrupt estate or that enable it to maintain its business." *In re CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y.1992) (citations omitted); *see also Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986) ("[i]f one claimant is to be preferred over others, the purpose should be clear from the statute.") (internal quotation omitted); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. 882, 889 (Bankr.S.D.N.Y.1993) ("A claim is not entitled to priority simply because the right to payment arose after the commencement of the reorganization proceeding.") (citation omitted).

■ The First Circuit, in *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976), established the following seminal two prong test to determine whether a claim merits treatment as an administrative expense: (1) the obligation must arise from a transaction with the debtor in possession, and (2) must result in a direct benefit to the estate. *Id.* at 954. Although *Mammoth Mart* applied § 64 of the former Bankruptcy Act, "numerous courts, including the Court of Appeals for the Second Circuit, have continued to follow Mammoth Mart's treatment of administrative expense claims in cases under the Code." *In re Chateaugay Corp.,* 102 B.R. 335, 354 (Bankr.S.D.N.Y.1989) (citations omitted).

Grossmont would be able to satisfy the first prong of the *Mammoth Mart* test at trial. Although the Lease was entered into prepetition, the Debtor had possession of the La Mesa Store during the post-petition period. Grossmont, however, would not be able to carry its burden with respect to the second part of this test because it would not be able to prove that the Debtor breached the Lease while it received a direct benefit under the Lease.

For the purpose of this discussion, the periods in which the Debtor conducted the court-approved store closing sale and the subsequent unsuccessful attempt to sell the leasehold interest are separately addressed. With respect to the period in which the Debtor conducted its store closing sale, it is assumed that the Debtor received a benefit by operating the La Mesa Store under the Lease. It is also assumed that the Debtor failed to comply with the Covenant to Stay Open while it conducted the store closing sale because Grossmont alleges that the Debtor did not conduct this sale under the trade name "Bullock's."

Under any set of facts, however, Grossmont could not demonstrate that the Debtor breached the Covenant to Stay Open because this Covenant is unenforceable against the Debtor because it conflicts with this Court's April 19, 1993 Order authorizing the Debtor to conduct the store closing sale as well as the Debtor's obligation to maximize estate assets for the benefit of all creditors. As previously noted, Grossmont objected to the Debtor's motion to conduct a store closing sale. After a hearing on notice, Grossmont's objection was overruled and the Debtor's motion was granted. The April 19, 1993 Order expressly provides that "no person or entity shall take any action to prevent, interfere with, or otherwise enjoin consummation of the Store Closing Sale, and *any provision in the Lease which would otherwise prohibit or restrict the Store Closing Sale is unenforceable*[.]" April 19, 1993 Order at 6 (emphasis supplied). Grossmont did not appeal this Court's ruling. The April 19, 1993 Order precludes enforcement of the Covenant because application of the Covenant to the store closing sale would vitiate the sale's

purpose and function; namely, the maximization of estate assets for the benefit of all creditors. Assuming that the store closing sale caused a breach of the Covenant which, in turn, gave rise to damages which might. very well exceed the benefits of holding such a sale, it can be easily said that the Covenant effectively prohibits and restricts the Store Closing Sale.

■ In similar fashion, the Covenant is unenforceable because it conflicts with the Debtor's fiduciary duty to maximize estate assets. This result is consistent with the Supreme Court's pronouncement in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55, 99 S.Ct. at 918. In this instance, the federal policy of maximizing estate assets for all creditors precludes enforcement of the Covenant to Stay Open because enforcement of this Covenant would prevent all creditors of the estate from receiving the benefit of the Debtor's discharge of its fiduciary duty. *See Ames,* 136 B.R. at 359 ("to enforce the anti-[going out of business] sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress.") Therefore, in view of the foregoing, the Covenant to Stay Open is unenforceable against the Debtor because it conflicts with this Court's April 19, 1993 Order and with the Debtor's duty to maximize estate assets.

■ With respect to the period in which the Debtor attempted to sell its leasehold interest after ceasing operations at the La Mesa Store, any damages which would flow from any breach of the Lease do not qualify as an administrative expense because Grossmont can not demonstrate that the Debtor's estate received any benefit under the Lease during this period. The Second Circuit has consistently held that the debtor must derive a benefit under a contract in order for the creditor's claim to be accorded administrative

expense priority, *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 955 (2d Cir.1993); *Amalgamated Ins. Fund,* 789 F.2d at 101; *Zelin v. Unishops, Inc. (In re Unishops, Inc.),* 553 F.2d 305, 308 (2d Cir.1977); *In re Freedomland, Inc.,* 480 F.2d 184, 189 (2d Cir.1973), *aff'd,* 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974), and has explained that "the purpose of according priority in these cases is fulfillment of the equitable principal of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him." *American A. & B. Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119, 126 (2d Cir.1960) (citations omitted). There is no dispute that after the store closing sale was concluded the Debtor was only engaged in an unsuccessful marketing effort to sell the leasehold. In other words, the Debtor enjoyed an option to assume and assign its leasehold interest during this period. An option or the potential to use or benefit from property does not amount to a benefit to the estate. *General Am. Transp. Corp. v. Martin (In re Mid Region Petroleum Inc.),* 1 F.3d 1130, 1133 (10th Cir.1993) ("a benefit to the estate results only from the use of the leased property"); *CIS,* 142 B.R. at 644 ("a mere potential benefit does not qualify as a benefit for the purposes of determining administrative expense status."); *In re Mainstream Access, Inc.,* 134 B.R. 743, 750 (Bankr.S.D.N.Y.1991); *In re ICS Cybernetics, Inc.,* 111 B.R. 32, 36–37 (Bankr.N.D.N.Y. 1989); *Broadcast Corp. v. Broadfoot,* 54 B.R. 606, 611 (N.D.Ga.1985), *aff'd,* 789 F.2d 1530 (11th Cir.1986); *In re Kessler,* 23 B.R. 722, 724 (Bankr.S.D.N.Y.1982), *aff'd,* 55 B.R. 735 (S.D.N.Y.1985) ("a claim which merely has the potential for value upon the happening of other events may not be allowed as an administrative expense.") (citation omitted); *see also American A. & B. Coal,* 280 F.2d at 119.

This case is factually distinguishable from *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.),* 851 F.2d 159 (6th Cir.1988) and the cases cited by Grossmont because in those cases the Debtors used the property in question, and their estates received benefits from such use. *See, e.g., Id.* at 162 ("this case involves a claim arising from United's post-petition continued use of leased equipment."); *Atlantic Container,* 133 B.R. at 980 (debtor in possession and subsequently, chapter 7 trustee, occupied non-residential real property). As Grossmont will be unable to demonstrate that the Debtor's estate received any benefit under the Lease after the store closing sale, the Debtor's Motion to Dismiss is granted with respect to Grossmont's request for § 503(b) administration expense priority.

## IV. CONCLUSION

In view of the foregoing, the Debtor's motion to Dismiss Grossmont's Motion is granted. Submit an order in accordance with the foregoing.